UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                            Plaintiff,

                                                                     Case #14-CR-6092-FPG
                                                                     Case #15-CR-6016-FPG

    v.

                                                                     DECISION AND ORDER

DORON FELDMAN,

                                            Defendant.
_____

## INTRODUCTION

In these two related cases, Defendant Doron Feldman ("Feldman") pleaded guilty to conspiring to commit mail fraud in violation of 18 U.S.C. § 1349 and filing a false tax return in violation of 26 U.S.C. § 7206(1).[1] Feldman was sentenced to 24 months imprisonment and, as relevant here, ordered to pay $1.46 million in restitution to the University of Rochester.

Feldman and the government are now engaged in a dispute regarding the government's attempt to levy a retirement account held in Feldman's name with the Sentinel Benefits and Financial Group (the "Sentinel Account"). The government argues that it is entitled to levy the Sentinel Account to satisfy the restitution order. Feldman argues that the government may not access the Sentinel Account for two reasons: (1) seizing the Sentinel Account would violate promises the government made as part of the plea agreement in this case; and (2) the Sentinel Account is exempt from seizure pursuant to the Employees Retirement Income Security Act of 1974 ("ERISA").

In a previous decision, the Court rejected Feldman's first argument and reserved decision on the second to allow the parties to submit supplemental briefing. ECF No. 46. The parties have

---

[1] *See* Case #14-CR-6092-FPG (conspiring to commit mail fraud), ECF Nos. 4, 12; Case #15-CR-6016-FPG (filing a false tax return), ECF Nos. 4, 6. The motions presently before the Court were filed in both cases. Unless otherwise noted, the Court will cite to the docket in Case #14-CR-6092 for the remainder of this decision.

now filed their supplemental briefs. ECF Nos. 48, 49. In addition, Feldman has filed a motion for reconsideration in which he argues that the Court's prior decision was erroneous. ECF No. 50. For the reasons stated below, the Court reaffirms its prior decision and finds that the Sentinel Account is not exempt from the government's collection efforts.

## BACKGROUND

On June 24, 2014, pursuant to a written plea agreement between Feldman and the government, Feldman pleaded guilty to conspiring to commit mail fraud in violation of 18 U.S.C. § 1349. *See* ECF No. 3.[2] The factual basis for that plea is set forth in the agreement. *See id.* ¶ 4. For the fiscal years 2008 through 2010, Feldman, a medical doctor and board-certified anesthesiologist, participated in a scheme to defraud the Department of Anesthesiology at the University of Rochester by causing the department to pay fraudulent "option fees" to Feldman and his co-conspirators. *Id.* This scheme defrauded the University of Rochester out of $1.46 million, $630,000 of which was received by Feldman himself. *Id.* ¶ 4f.

The plea agreement includes separate sections regarding restitution and forfeiture. In the restitution section, the parties agreed that the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, required the Court to order Feldman to pay restitution in the amount of $1.46 million to the University of Rochester. *Id.* ¶ 19. Feldman also agreed "to disclose fully and completely all assets in which [he] either has any property interest or over which [he] exercises control, directly or indirectly, including those held by a spouse, nominee or other third party." *Id.* ¶ 20.

In the forfeiture section, Feldman agreed not to contest the government's seizure of three bank accounts totaling $992,939.98.[3] *Id.* ¶¶ 27-30; *see* ECF No. 10. Most importantly, the

---

[2] Feldman pleaded guilty to the false tax return charge at a later date pursuant to a separate written agreement. *See* Case #15-CR-6016-FPG, ECF No. 3. That agreement is not at issue here.
[3] Because two of the forfeited assets are investment accounts, their precise value has fluctuated over time. The Court will refer to the value of the forfeited assets at the time of sentencing.

2

forfeiture section also included the following language:

> The defendant further agrees that the forfeiture of the aforementioned funds as authorized herein shall not be deemed an alteration of the defendant's sentence. Forfeiture of the defendant's property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture. However it is understood by the defendant that the government may, in its discretion, recommend to the Attorney General that any of the forfeited proceeds be remitted or restored to eligible victims of the offense, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. Pt. 9, and other applicable law, it being understood that the United [States] Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests with the Department of Justice, which will make its decision in accordance with applicable law.

ECF No. 3 ¶ 31.

The plea agreement concludes with a "merger" or "integration" clause that reads as follows:

> This plea agreement represents the total agreement between the defendant, DORON FELDMAN, and the government. There are no promises made by anyone other than those contained in this agreement. This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

*Id.* ¶ 33.

The Court sentenced Feldman on February 18, 2015. *See* ECF Nos. 18, 20. Prior to sentencing, Feldman wrote a check to the University of Rochester for $467,060.02—the difference between the $1.46 million restitution and the $992,939.98 forfeiture—in anticipation that the forfeited funds would be applied towards restitution. At sentencing, the government commented on the restitution issue:

> MR. RESNICK: The restitution of $1.46 million is to be ordered. The Government—I just wanted to clarify. The Government has seized approximately a million dollars, a little less than a million dollars of Dr. Feldman's assets when this case first started and when we were investigating it.

3

> Mr. Feldman has recently paid the U of R about $467,000. We anticipate applying the forfeited funds to the restitution amount, if we get approval from DOJ down in Washington.
>
> But, technically, the restitution has not been paid yet in full. We're hoping that we can get that million dollars in seized funds, you know, applied towards the restitution amount, but we won't know that for probably a month or two.
>
> THE COURT: That was always the expectation?
>
> MR. RESNICK: Yes, that's the expectation. But it has been provided to counsel many times that there's no guarantee, you know, our hands are tied and we have to do what DOJ provides. But we are going to ask that 100% of it be applied towards the restitution amount.

ECF No. 20, 38:15-39:10. Feldman's attorney agreed with the government's characterization of the parties' agreement. *Id.* 39:12 ("Mr. Resnick is correct and I totally agree."). In addition, Feldman's attorney pointed out that Feldman had already surrendered more money than the $630,000 he had personally received as part of the fraudulent scheme. *Id.* 39:17-40:2. Pursuant to the MVRA and the parties' plea agreement, the Court ordered Feldman to pay $1.46 million in restitution to the University of Rochester. *Id.* 48:12-16.

On March 5, 2015, Assistant United States Attorney Grace Carducci submitted a restoration request to the Department of Justice's Asset Forfeiture and Money Laundering Section ("AFMLS").[4] Carducci asked AFMLS to use the money Feldman had forfeited to pay back the University of Rochester and satisfy Feldman's restitution obligation. As relevant here, Carducci listed assets owned or controlled by Feldman and represented to AFMLS that "reasonable efforts to locate additional assets establish that the victim does not have recourse reasonably available to other assets from which to obtain compensation for their loss."

On August 7, 2015, Carducci submitted an addendum to the government's restoration

---

[4] Restoration is the process for seeking the Attorney General's authority to apply forfeited funds to a restitution order in the same case. AFMLS has delegated authority from the Attorney General to decide restoration requests.

request. In this addendum, Carducci notified AFMLS that she had become aware of additional assets that Feldman had an ownership interest in, including the Sentinel Account at issue here. Carducci stated that "[w]e believe the below addendum is vital to the determination of our request, as the additional assets may provide recourse reasonably to other assets from which the victim may obtain compensation for its loss in this matter." However, Carducci did not rescind the government's restoration request. Rather, the addendum retained the government's original assertion that "the victim does not have recourse reasonably available to assets from which to obtain compensation for their loss."

On March 14, 2016, AFMLS denied the government's restoration request. AFMLS provided the following reasoning for its decision:

> The request for restoration submitted by your office in this case is denied because Doron Feldman is independently capable of satisfying the restitution order through bank and investment accounts discovered after the sentencing of Feldman. According to *Asset Forfeiture Policy Manual* (2013), Chap. 12, Sec. I.B., a request for restoration should be denied if the victims have recourse reasonably available to other assets from which to obtain compensation for their losses.

On March 16, 2016, the parties appeared for a status conference to discuss the issue at hand. *See* ECF Nos. 32, 34. The government acknowledged that it had made representations, during the course of plea negotiations with Feldman, that it would submit a restoration request to AFMLS. *See* ECF No. 34 at 5:19-20, 6:4-5, 10:21-23, 14:1-4, 15:10, 18:2-3. However, the government disputed Feldman's assertion that it has not fulfilled that promise or any other promises it made in this case.[5]

---

[5] Also at the March 16, 2016 status conference, Feldman's attorney requested that the Court order the government to turn over the restoration request it submitted to AFMLS and the subsequent addendum to that request. *See* ECF No. 34 at 28:20-25. The government objected, citing the work product doctrine. *Id.* at 29:5-11. The Court ordered the government to supply those documents to the Court *ex parte*. *Id.* at 34:12-13.

After reviewing the documents submitted by the government, it is obvious that the work product doctrine does not apply. The work product doctrine applies to documents "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3); *see United States v. Adlman*, 134 F.3d 1194, 1196-97 (2d Cir. 1998). The government's restoration request and subsequent addendum were not prepared in anticipation of litigation and do not reference any

5

**DISCUSSION**

As described above, there are two points of contention between Feldman and the government. First, the parties dispute whether the government fulfilled the promises it made as part of the plea agreement in this case. Feldman argues that as part of his plea agreement, the government agreed to recommend that Feldman's forfeited assets be applied towards restitution and that the parties "always expected" that restoration would be allowed. The Court previously ruled in favor of the government on this issue, *see* ECF No. 46, and Feldman now moves for reconsideration of that decision. Second, the parties dispute whether ERISA shields the Sentinel Account from the government's reach. The Court will address each issue in turn.

**I.     Motion for Reconsideration**

In its previous decision, the Court's reasoning was principally based on the clear and unambiguous language of the parties' written plea agreement. *See* ECF No. 46. Paragraph 31 of the plea agreement states that the forfeiture of Feldman's property *shall not* be treated as satisfaction of any restitution ordered by the Court but the government *may, in its discretion*, recommend to the Attorney General that the forfeited funds be applied towards restitution. ECF No. 3 ¶ 31. Further, the parties understood that "the United [States] Attorney's Office has authority *only to recommend* such relief and that the final decision of whether to grant relief rests with the Department of Justice, *which will make its decision in accordance with applicable law*." *Id.* (emphasis added). The meaning of this paragraph is obvious: the government did not promise that it would make a restoration request to AFMLS, and it certainly did not guarantee that such a request—if made—would be granted.

The Court also rejected Feldman's attempt to look beyond the four corners of the written

---

anticipated litigation at all. Rather, these documents were created with a simple, practical purpose: to formally request that AFMLS use the money Feldman had forfeited to satisfy Feldman's restitution obligation to the University of Rochester. Therefore, the Court will file the government's restoration request and its subsequent addendum as part of the record in this case.

plea agreement. Arguments regarding expectations, representations, and understandings that were not memorialized in the written agreement would not only contradict the plain language in that agreement but would also negate the agreement's merger clause, which specifically states: "There are no promises made by anyone other than those contained in this agreement. This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant." *Id.* ¶ 33.

Feldman argues that the Court erred by finding that the parties' plea agreement "clearly and absolutely prohibits restoration of the forfeited funds to the victim." This argument rests on a mischaracterization of the Court's previous decision. Although the Court rejected Feldman's argument that the plea agreement *required* the government to make a restoration request to AFMLS, it did not find that the agreement *prohibited* such a request. Rather, as described above, paragraph 31 of the plea agreement unambiguously states that the government "*may, in its discretion*, recommend to the Attorney General that any of the forfeited proceeds be remitted or restored to eligible victims of the offense." *Id.* ¶ 31 (emphasis added). In other words, the plea agreement did not require the government to submit a restoration request or prohibit it from doing so; it simply gave the government discretion to make that choice.

Feldman also argues that the Court's previous decision erroneously "treats Dr. Feldman as a merchant entering into a contract with another merchant rather than as a defendant in a criminal proceeding." Again, Feldman mischaracterizes the Court's previous opinion.

The Court recognizes that plea agreements are "unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain." ECF No. 46, at 3-4 (citing *United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999)). Courts construe plea agreements strictly against the government and resolve any ambiguities in favor of the defendant. *See United States v. Podde*, 105 F.3d 813, 820 (2d Cir. 1997) (quoting *United States v. Ready*, 82

7

F.3d 551, 559 (2d Cir. 1996)); *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 167 (2d Cir. 2000). "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971).

Nevertheless, the Court's role in this context is to determine "what the parties to [the] plea agreement reasonably understood to be the terms of the agreement." *United States v. Rivera*, 954 F.2d 122, 124 (2d Cir. 1992) (quoting *Paradiso v. United States*, 689 F.2d 28, 31 (2d Cir. 1982) (per curiam), cert. denied, 459 U.S. 1116 (1983)). Of course, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 69 (2d Cir. 2005) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)). "The words of the plea agreement control, and their meaning is measured by objective, not subjective standards." *Mask v. McGinnis*, 252 F.3d 85, 90 (2d Cir. 2001).

Here, as described above and in the Court's previous decision, the plea agreement clearly and unambiguously did not require the government to make a restoration request to AFMLS. ECF No. 3 ¶ 31. The agreement also clearly and unambiguously states that it "supersedes any other prior agreements, written or oral, entered into between the government and the defendant." *Id.* ¶ 33. In its previous decision, the Court simply held that these provisions negate Feldman's argument that the government had breached its promises under the plea agreement.

Feldman's best argument is that the government promised him that it would make a restoration request as an inducement to enter his plea, even though that promise was never memorialized in the plea agreement. The government acknowledges that it did represent to Feldman, during the course of plea negotiations, that it would submit a restoration request to AFMLS after sentencing. *See* ECF No. 34 at 5:19-20, 6:4-5, 10:21-23, 14:1-4, 15:10, 18:2-3.

But even if that promise became a binding element of the parties' plea agreement—despite

8

the fact that no such promise was included in the written plea agreement and such a promise would be incompatible with the plain language of the agreement that the parties actually entered into—the record establishes that the government held up its end of the bargain. On March 5, 2015, the government submitted a restoration request to AFMLS in which it asked AFMLS to apply Feldman's forfeited assets towards his restitution obligation. Even when the government submitted the addendum in which it identified additional assets,[6] the government did not rescind its restoration request and in fact retained its original assertion that "the victim does not have recourse reasonably available to assets from which to obtain compensation for their loss."

Although Feldman argues that the parties "always expected" that the restoration request would be granted, there is no indication in the record that those expectations ever materialized into promises or guarantees. On the contrary, the government cautioned at sentencing that Feldman's restitution obligation would only be satisfied "if we get approval from DOJ down in Washington" to use the forfeited funds for that purpose and that "it has been provided to counsel many times that there's no guarantee, you know, our hands are tied and we have to do what DOJ provides." ECF No. 20, 38:15-39:10. Feldman's counsel responded to that point by stating that the government "is correct and I totally agree." *Id.* 39:12.

In sum, the record establishes that the government did not breach any promises it made as part of the plea agreement in this case. Feldman's arguments to the contrary are unavailing, and his motion for reconsideration is based on mischaracterizations of the Court's previous decision. Therefore, Feldman's motion for reconsideration is denied and the Court reaffirms its previous decision.

---

[6] Feldman does not argue that the government promised to omit any assets from its restoration request or make any false representations to AFMLS. Feldman agreed to full and complete disclosure of all his assets. *See* ECF No. 3 ¶ 20. The Department of Justice's Asset Forfeiture Policy Manual, which includes the rule AFMLS relied on to deny the government's restoration request in this case, is a public document and is available online. *See* Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section (MLARS), https://www.justice.gov/criminal-mlars/publications (last visited Aug. 30, 2017).

**II.     ERISA Protection**

The funds at issue in the Sentinel Account are held pursuant to the Great Lakes Anesthesiology, P.C. Deferred Profit Sharing Plan (the "Plan").[7]  *See* ECF No. 48 at 2; ECF No. 49, Ex. A.  Under the Plan, Feldman is entitled to receive the vested percentage of his account balance upon "termination of employment for reasons other than death, disability, or retirement."  ECF No. 49, Ex. A, at 6.  According to Feldman's Pre-Sentence Report, Feldman was terminated from CGF Anesthesiology Associates, P.C. on June 13, 2013 as a result of the offense underlying this case.

The default form of distribution under the Plan is a joint and 50% survivor annuity.  *See id.* at 7.  Any other form of distribution, such as a single lump-sum payment, would require spousal consent.  *Id.* at 8.  The parties agree that Feldman's wife has not consented to any other form of distribution, meaning that the government would be limited to taking the annuity payments that would otherwise go to Feldman himself.  *See* ECF No. 48 at 4-6; ECF No. 49 at 3-4.

The parties also agree that the Plan is covered by ERISA.  ERISA protects covered retirement benefits from dissipation through payment to third parties by providing that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated."  18 U.S.C. § 1056(d)(1).  Feldman argues that this anti-alienation provision shields the Plan from the government's collection efforts.

The government, on the other hand, cites its authority under the MVRA to enforce criminal restitution orders.  After providing that the United States may enforce restitution orders in the same manner as criminal fines, *see* 18 U.S.C. §§ 3663A(d), 3664(m)(1)(A)(i), the MVRA states that

---

[7]     Prior to March 11, 2014, this plan was titled CGF Anesthesiology Associates, P.C. Deferred Profit Sharing Plan.  The government also seeks to levy funds held pursuant to the Great Lakes Anesthesiology, P.C. Cash Balance Plan ("Cash Balance Plan").  *See* ECF No. 49, Ex. B.  Feldman does not refer to the Cash Balance Plan in making his arguments.  *See* ECF No. 48 at 2.  To the extent Feldman is attempting to shield both plans from the government's collection efforts, the following analysis also applies to the Cash Balance Plan.

"[n]otwithstanding any other Federal law (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against all property or rights to property of the person fined." 18 U.S.C. § 3613(a).

In *United States v. Novak*, 476 F.3d 1041 (9th Cir. 2007) (en banc), the Ninth Circuit specifically addressed this apparent tension between ERISA and the MVRA. After a careful examination of both statutes, the court in *Novak* held that the MVRA's broad authorization to enforce restitution orders against *all* of the defendant's property *notwithstanding any other federal law* overrides ERISA's alienation restrictions. *Id.* at 1044-1060. Therefore, to enforce a restitution order under the MVRA, the government may "step into the shoes" of the defendant and garnish the defendant's interest in a retirement plan covered by ERISA. *Id.* at 1060-64.

This Court is persuaded by the thorough analysis in *Novak* and adopts that same reasoning here.[8] *See also United States v. Irving*, 452 F.3d 110, 126 (2d Cir. 2006) (similarly holding that the MVRA permits courts to consider ERISA-protected funds when issuing a restitution order in the first instance); *United States v. Hotte*, No. 97 CR 669(SJ)(RML), 2007 WL 2891313, at *3 (E.D.N.Y. Sept. 28, 2007) (citing *Novak* for the proposition that "criminal restitution orders can be enforced by garnishing retirement funds where the defendant has a current, unilateral right to receive payments under the terms of the retirement plan") (internal quotations omitted).

Here, although Feldman cannot take the funds in the Sentinel Account in the form of a lump-sum payment without spousal consent, he does have a current, unilateral right to receive joint and 50% survivor annuity payments under the terms of the Plan. Pursuant to this Court's

---

[8] Feldman argues that *Novak* is distinguishable because annuity payments would only provide the University of Rochester with "delayed, and potentially insufficient, compensation," while the forfeited funds could immediately and completely compensate the victim for its losses. ECF No. 48 at 8. The Court disagrees. Feldman agreed to forfeit three bank accounts to the United States as proceeds of his crime. *See* ECF No. 3 ¶ 27. Feldman's argument that those funds should be used to satisfy his restitution obligation may be grounded in some common sense, but it is not a persuasive reason to distinguish *Novak*. Rather, it is essentially a challenge to AFMLS's decision to deny the government's restoration request.

restitution order and the MVRA, the government may step into Feldman's shoes and garnish the annuity payments that Feldman would be entitled to. Therefore, Feldman's motion to vacate the government's writ of garnishment based on the alienation restrictions in ERISA is denied.

## CONCLUSION

For the reasons stated, the Court reaffirms its previous decision and finds that ERISA's alienation restrictions do not shield the Sentinel Account from the government's collection efforts. Therefore, Feldman's motion for reconsideration (ECF No. 50) is DENIED and Feldman's motion to vacate the government's writ of execution (ECF No. 28) is also DENIED. The government may step into Feldman's shoes and levy Feldman's interest in the Sentinel Account.

IT IS SO ORDERED.

Dated: September 5, 2017
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court